**DICK WARNER CARGO HANDLING CORPORATION, Plaintiff-Appellant, Cross-Appellee,**

v.

**AETNA BUSINESS CREDIT, INC., Defendant-Appellee, Cross-Appellant.**

**No. 1101, Dockets 84–7029, 84–7065.**

United States Court of Appeals, Second Circuit.

Argued April 17, 1984.

Decided Oct. 11, 1984.

George E. Tillinghast, Jr., Twachtman & Tillinghast, Glastonbury, Conn., for plaintiff-appellant, cross-appellee.

David Brown, Meriden, Conn. (Tarlow, Levy, Mandell & Kostin, Thomas J. Welsh, Meriden, Conn. on the brief), for defendant-appellee, cross-appellant.

Before FRIENDLY, PIERCE and WINTER, Circuit Judges.

FRIENDLY, Circuit Judge:

This troubling case, a diversity action removed from a Connecticut state court, is here for the second time. *See* 700 F.2d 858 (2d Cir.1983). Although the facts are stated in Judge Blumenfeld's first opinion, 538 F.Supp. 1049 (D.Conn.1982), and in this court's opinion on the appeal therefrom, they must be recapitulated in summary fashion.

On April 10, 1979, Aetna and Best Banana entered into a financing arrangement evidenced by a General Loan and Security Agreement, an Accounts Receivable Rider, a further Rider, and a Continuing Letter of Credit Agreement (collectively, the "Agreements"). Aetna agreed to lend money to Best Banana in its discretion and to obtain letters of credit to enable Best Banana to make purchases from overseas suppliers. In paragraph (2) of the General Loan and Security Agreement, Best Banana, as debtor, granted Aetna a security interest in certain property, including its inventory, accounts and other receivables, as well as "[a]ll contract rights and general intangibles including ... deposit accounts whether now owned or hereafter created or acquired." As regards the obligations secured, paragraph (2) broadly provided that the grant of security was

> [f]or the purpose of collateralizing any and all sums loaned or advanced by Aetna to Debtor and any and all other Obligations or liabilities of any and every kind, including all liabilities arising under agreements and contracts of guaranty, now or hereafter owing and to become due from Debtor to Aetna, including all interest thereon, howsoever created, evidenced, acquired or arising whether under this Agreement or any other instruments, obligations, contracts or agreements of any and every kind, now or hereafter existing or entered into between the Debtor and Aetna or otherwise and whether direct, indirect, primary, secondary, fixed or contingent (herein collectively referred to as "Obligations") [.]

Among the obligations of Best Banana thus secured were its undertakings in the Agreements (1) to repay to Aetna the principal amount of any advances, together with interest thereon; (2) to indemnify Aetna for any liability, loss or expense incurred as a result of or in connection with any letter of credit or Aetna's application

therefor; (3) to pay Aetna $7,500 a month as a "minimum charge," although this obligation was to be reduced to the extent of interest on the advances and commissions on the letters of credit actually due; and (4) to reimburse Aetna for its expenses in enforcing or protecting its security interest or its rights under any of the Agreements "or in respect of any of the transactions to be had thereunder."

In order to perfect its security interest in the collateral, Aetna filed financing statements on April 13 and 17, 1979.[1] It then advanced certain funds to Best Banana and on April 23 applied to Nordic American Bank ("Nordic") for the issuance of an irrevocable letter of credit ("L/C") in the amount of $1,104,000 for the benefit of an Ecuadoran banana shipper, Exportadora Constructora Regional, Ltda. ("Exportadora").

The L/C having been issued, Exportadora made two shipments of bananas to Best Banana in June 1979, with delivery in Virginia, where plaintiff Dick Warner Cargo Handling Corporation ("Warner") unloaded them pursuant to an agreement with Best Banana. The latter claimed the bananas were defective and Aetna requested Nordic not to honor the L/C. Nordic complied. On October 31, 1980, Exportadora began an action in New York against Nordic, Aetna and Best Banana, in which it alleged that the letter of credit had been wrongfully dishonored.

Meanwhile, Warner, which had not been paid for its services in unloading the shipments, sued Best Banana in a Virginia court and was awarded a judgment of $80,651.86 in November 1979. Warner then brought an action in the Hartford, Connecticut, Superior Court to collect the judgment through garnishment of Best Banana's credit balance with Aetna, described below. Garnishment process was served on January 11, 1980, and judgment was rendered on June 25, 1980, against Best Banana as defendant and Aetna as garnishee. When Aetna refused satisfaction, Warner instituted a *scire facias* action against it in the Superior Court, which Aetna removed to the District Court for Connecticut pursuant to 28 U.S.C. § 1441(a).

Pursuant to the Agreements, Best Banana's collections on its encumbered accounts had been deposited in a "lockbox" bank account and forwarded to Aetna for credit against its various obligations. Prior to the garnishment, $399,366.02 had been remitted to Aetna, some $353,576.91 of which was used to discharge Best Banana's current indebtedness for advances, interest, and other charges. This left $45,789.11 as a net credit balance, which, under the Agreements, Aetna held as additional security for obligations of Best Banana that might later accrue. Warner's garnishment was aimed at this credit balance, thereby raising the question whether the priority to which Aetna's perfected security interest would normally be entitled *vis-a-vis* a later judicial lien extended to obligations which had been undertaken before, but matured after, the creation of the lien (to wit, Best Banana's obligations to reimburse Aetna for its attorneys' fees and other expenses incurred in defending Exportadora's and Warner's suits and to pay "minimum monthly charges"), or to obligations which had been undertaken before the creation of the lien but which might or might not become due at some future date (the obligation to indemnify Aetna for any liability on the dishonored L/C).

The case came before Judge Blumenfeld on cross-motions for summary judgment; he denied Warner's and granted Aetna's. 538 F.Supp. 1049. The parties, apparently expecting that the case would turn on the priority issue, "urged the court to adopt various interpretations of section 9–301(4)

1. Judge Blumenfeld carefully noted in his first opinion, *supra*, 538 F.Supp. at 1051 n. 1, "that the description of the collateral which is required to be part of the financing statement under New York law, New York U.C.C. § 9–402(1), is not attached to the copies of the fi- nancing statements submitted to the court." He assumed, "[b]ecause the parties have not made an issue of the sufficiency of the description," that "the descriptions are adequate and properly filed." So do we.

of the Uniform Commercial Code to dispose of the matter." *Id.* at 1052 (footnote omitted). The district judge, however, found it "unnecessary to employ the cited statute to decide this case," *id.,* based on his conclusion that Warner had not in fact succeeded in acquiring a garnishment lien under Connecticut law. According to the district judge, because "Best Banana's right to the collateral is dependent upon Aetna incurring no expense of the sort mentioned in the security agreement," its claim to the surplus in Aetna's hands was "only ... contingent," and Aetna "cannot be said to be indebted to Best Banana at this time." *Id.* at 1053. Under these circumstances, the district court concluded, Warner could not effect garnishment under Connecticut law, *see Wilber v. New Haven Water Co.,* 37 Conn.Supp. 877, 880, 441 A.2d 863, 865 (1982). There was thus no need for inquiry into the respective priorities of Aetna and Warner under the Uniform Commercial Code.

On appeal, *see* 700 F.2d 858 (2d Cir.1983) ("*Warner I* "), this court took a different view of the Connecticut law of garnishment. Citing a number of Connecticut cases, it held that "under Connecticut law, a garnishable debt need not be one on which the debtor could successfully demand immediate payment," and that "while a debt is not due if it does not arise until the occurrence of a condition precedent ..., a debt is due and garnishable even though the debt may 'be defeated by a condition subsequent.'" *Id.* at 862 (citations omitted). The opinion continued:

> Thus, it is possible to say, as the District Court did, that the $45,789.11 in the Aetna account is not 'due' to Best Banana until Aetna's security agreement claims have been shown to be satisfied. But it could as well be said that the positive balance in the Aetna account was 'due' to Best Banana on January 11, 1980, subject to the condition subsequent that Aetna's claims—those for which section 9–301(4) entitles it to the benefit of its security interest—are satisfied out of the fund.

*Id.* (footnote omitted). The court concluded that "the better view is that, whenever the conditions of a security agreement affect the 'dueness' of collateral [*viz.,* Best Banana's claim against Aetna for the amount of the credit balance], those conditions should be considered conditions subsequent," *id.* at 862–63. However, this established only that "Warner has ... achieved the status, effective January 11, 1981 [*sic:* 1980], of an intervening lien creditor." *Id.* at 863. The court returned the case to the district court to determine the relative priority of Aetna's and Warner's interests in the light of this conclusion.

Judge Blumenfeld construed this court's opinion as requiring him to determine whether the various obligations that Aetna claimed to be secured by the collateral related to "advances" of the sort specified in § 9–301(4) of the New York U.C.C. so as to take priority over a lien creditor like Warner. Section 9–301(4), which was added to the U.C.C. in 1972 and adopted by New York in 1977, provides that:

> [a] person who becomes a lien creditor while a security interest is perfected takes subject to the security interest only to the extent that it secures advances made before he becomes a lien creditor or within 45 days thereafter or made without knowledge of the lien or pursuant to a commitment entered into without knowledge of the lien.

In an unpublished ruling, the judge concluded that Aetna's post-garnishment expenses for attorneys in the Exportadora action and in this one constituted advances within that section. He also ruled, although this turned out to have no practical importance, that Aetna's potential liability on the L/C would be or result from an advance qualifying for priority over Warner under § 9–301(4) and that the "minimum charges" of $7,500 a month for interest and commissions that had accrued after the garnishment would not. Finding that Aetna, subsequent to January 11, 1980, had paid $48,785.12 for attorneys' fees and expenses, as against the $45,789.11 it owed Best Banana, the court determined that the

fund sought to be garnished had been exhausted and dismissed Warner's action with prejudice. Warner has appealed from this dismissal. Aetna has cross-appealed from the judge's ruling in respect of the "minimum charges" accruing after the garnishment.

## DISCUSSION

■ The district court felt constrained, on remand, with much justification, to apply U.C.C. § 9–301(4) in deciding the priority it should accord the obligations Aetna claimed to be secured by the collateral relative to Warner's lien. Warner enthusiastically accepts this approach, but insists that, with respect to the attorneys' fees and Aetna's exposure on the L/C, the judge reached the wrong result since these were not "advances" or, if they were, were not among the four categories protected by § 9–301(4), and that, under the plain words of the statute, a lien creditor is entitled to priority over any security interest other than advances so protected, leaving unprotected even non-advances. It places particular stress on footnote 5 of *Warner I, supra,* 700 F.2d at 863, which stated that "[a]rguably, section 9–301(4) covers only transactions in which the secured party advances new assets to the debtor and does not allow the secured party to increase its secured interest by assuming liabilities by a prior commitment." Warner conveniently ignores the introductory adverb as well as the further statement that the court "need not and do[es] not now assess this or any alternative theory of section 9–301(4)." Our own examination of the question has led us to conclude that section 9–301(4) is essentially irrelevant to the determination of Aetna's rights. In our opinion, section 9–301(4) was not meant broadly to affect the general rule establishing the priority of obligations undertaken by the debtor to a lender and embodied in a perfected security interest before another person became a lien creditor, *see* U.C.C. § 9–301(1)(b), but

was designed only to except from that rule a narrow class of transactions not at all of the nature of those here at issue. Hence, we agree with the district court that Warner's action should be dismissed, although we reach that result by different reasoning.

When a prospective borrower and a lender meet to set up a financing structure, they agree on many things. The lender often makes immediate advances and sets up a program, mandatory or discretionary, for future ones. In return, the borrower undertakes various obligations—not only to repay the advances, but to pay interest and to indemnify the lender against various expenses that he may be obliged to make. Most such expenditures do not constitute "advances" as that term is commonly used; in the ordinary meaning of language, "advances" are sums put at the disposal of the borrower—not expenditures made by the lender for his own benefit. *See, e.g.,* Black's Law Dictionary 48 (5th ed. 1979). We will call the debtor's obligations to pay interest and to indemnify the lender for various expenses incurred by him obligations for "non-advances." It cannot be that if the lender perfects his security interest with respect to such obligations, he is not entitled to protection against a subsequent lien creditor when, as here, the obligations relate to transactions that had occurred long before the lien attached.

The necessity for this conclusion is most readily illustrated by the common arrangement whereby a debtor makes a secured promise to pay interest on his secured debt. No one could plausibly argue that a debtor's periodic incurring of an obligation to pay interest was the receipt of an "advance" by him. Yet, on Warner's literal reading, § 9–301(4) would give priority to a lien creditor over a lender's perfected security interest not only as to interest on protected advances accruing *after* the creation of a lien,[2] a result which we regard as inconsistent with the basic purposes of the

2. This view appears to be taken by Carlson & Shupack, *Judicial Lien Priorities Under Article 9 of the Uniform Commercial Code* (pt. 1), 5 Cardozo L.Rev. 287, 356 & n. 294 (1984). They

accurately predict that their position as to the status of post-lien interest "may strike some as surprising and, perhaps, alarming."

U.C.C., but also as to the debtor's obligation to pay interest that accrued *before* the levy, a result that could not possibly have been deliberate. A review of the circumstances and commentary accompanying the 1972 amendments to the U.C.C., which added § 9–301(4), convinces us that no such result was intended, the letter of that section notwithstanding.

In keeping with Article 9's general policy of validating the "floating lien," § 9–204(5) of the 1962 Code [3] provided that the obligations secured by a security interest could relate not only to present loans and "future advances" but also to "other value." Obligations of the latter sort correspond to what we have called "non-advance obligations." *Cf.* 2 R. Alderman, A Transactional Guide to the Uniform Commercial Code § 7.22 at 957 (2d ed. 1983) (distinguishing "future value" from "future advances"). Nothing in the U.C.C. limited the protection offered by filing and perfection to obligations securing "advances," and the instruments here must be typical of millions in which creditors have properly sought such protection. There does not appear to have been any doubt that a perfected interest securing a non-advance obligation undertaken by the debtor before the creation of a

judicial lien would take priority thereover, under §§ 9–201 and –301(1)(b),[4] even though the obligation had not become due until after the creation of the lien.[5] Had this case arisen under the 1962 Code, we should thus have thought it clear beyond peradventure that Aetna would prevail. The question is whether this conclusion survives enactment of § 9–301(4).

The most authoritative statement of the background of that section, paragraph (5) of the "Reasons for 1972 Change" appended to the Official Comment on § 9–312, begins by noting that "[t]he priority of *future advances* against an intervening party has been the subject of much discussion and disagreement" (emphasis added). A review of this controversy confirms the limited scope of the intended change. The protagonist in the debate was Peter F. Coogan, a prominent Boston lawyer particularly versed in commercial law and a member of the National Sponsors' Subcommittee on Article 9. Mr. Coogan advanced an ingenious argument that would have permitted a lien creditor to prevail, even under the unamended Code, over a prior-perfected security interest to the extent that it secured advances made subsequent to the creation

---

**3.** Section 9–204(3) is the corresponding provision in the 1972 version.

**4.** Section 9–201 ("General Validity of Security Agreement") stated that,

> [e]xcept as otherwise provided by this Act a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors.

Notwithstanding the broad reference to effectiveness against creditors, § 9–301(1)(b) "otherwise provided" that

> an unperfected security interest is subordinate to the rights of ... a person who becomes a lien creditor ... before [the security interest] is perfected[.]

Taken together, these sections—which are so far as here relevant the same as their 1972 counterparts—imply that a security interest perfected *before* the creation of a lien is not subordinate thereto. *See* R. Henson, Secured Transactions Under the Uniform Commercial Code § 5–2 at 74 (1973); Note, *Priority of Future Advances Lending under the Uniform Commercial Code,* 35 U.Chi.L.Rev. 128, 136 (1967). For brevity's sake, we shall refer to this implication as the rule stated in § 9–301(1)(b).

**5.** *See, e.g., In re Continental Vending Mach. Corp.,* 543 F.2d 986, 992–93 (1976) (New York law; 1962 Code) (debtor's secured obligation to reimburse secured party for collection and enforcement expenses extends to post-bankruptcy expenditures for attorneys' fees). *But see In re Apollo Travel, Inc.,* 567 F.2d 841, 844–45 (8th Cir.1977) (Minnesota law; 1962 Code), which held that a debtor's contractual obligation to pay a secured party's litigation expenses was "not secured after the [initial] loans were repaid and bankruptcy intervened before any actual indebtedness arose" (footnote omitted). We note that this conclusion appears to have rested in large part on the court's conviction that

> [p]ermitting such speculative "debts" to be asserted as secured claims in a bankruptcy action would unreasonably delay and impede the administration of the bankruptcy laws.

*Id.* at 844. Such considerations are absent from the instant case, which is concerned only with a question of priority of interests under New York law. Nothing in this opinion is intended to state a rule regarding the allowance or other disposition of claims in bankruptcy.

of the lien. As conceived by Mr. Coogan, a secured party who made multiple advances pursuant to a security agreement acquired a corresponding multiplicity of security interests, one per advance, the priority of each of which relative to the lien must be determined separately. See Coogan & Gordon, *The Effect of the Uniform Commercial Code upon Receivables Financing*, 76 Harv.L.Rev. 1529, 1549–51 (1963).

Coogan put a case, *see id.* at 1549, in which (1) a secured party advanced $100 on January 1 under a filed agreement giving him security in the debtor's accounts; (2) a creditor levied on the collateral on February 1; and (3) the secured party advanced an additional $500,000 on February 10. Under his "separate security interests" theory, the secured party would have *two* interests in the collateral, securing, respectively, the debtor's obligations to repay $100 and $500,000. Under § 9–301(1)(b) of the 1962 Code, the security interest securing the January 1 advance would have defeated the lien. Coogan argued, however, that, in the absence of a binding commitment to lend, the February 10 interest, securing the $500,000 advance would not. Under the rule that a security interest cannot be perfected until it attaches, *see* § 9–303(1), the second interest would not have been perfected until the secured party made the second advance, thereby supplying the "value," *see* § 1–201(44)(a), without which an interest could not attach under former § 9–204(1).[6] Hence, the judicial lien created on February 1 would have priority over the interest securing the February 10 advance, although it would remain subordinate to the January 1 security interest, which attached and was perfected on that date as a result of the contemporaneous

advance. *Cf.* Coogan, *Intangibles as Collateral Under the Uniform Commercial Code*, 77 Harv.L.Rev. 997, 1028 (1964).

Responding to Coogan's analysis, Professor Gilmore, in his deservedly influential treatise, Security Interests in Personal Property (1965), argued "for the idea of 'one security interest' over that of 'separate security interests.' " § 35.6 at 937 n. 5. On this view, a security agreement providing for multiple advances would create a single interest, which, having attached and become perfected upon the *initial* advance,

> may thereafter fluctuate as to the amount of the obligation secured, whenever [the debtor] pays down part of the loan or whenever [the secured party] makes further advances; it does not become a new or separate security interest simply because the outstanding unpaid balance of the loan varies from time to time.

*Id.* at 938. Combined with the priority rule stated in § 9–301(1)(b), this would mean that the secured party in Coogan's hypothetical would date the perfection of his (single) interest from January 1 and therefore prevail against the lien creditor even as to the February 10 advance. *See also* Note, *Priority of Future Advances Lending Under the Uniform Commercial Code*, 35 U.Chi.L.Rev. 128, 137 (1967) ("If a single, mushrooming security interest is created, then all advances are embraced and continuously perfected from the time value is first given." (footnotes omitted)).

The elegance of Professor Gilmore's conception gives it considerable theoretical appeal. But whatever the ultimate merits of the Coogan-Gilmore debate,[7] it is clear that

---

**6.** This requirement persists in § 9–203(1)(b) of the 1972 Code.

**7.** Ironically, the controversy generated next to nothing in the way of reported decisions. The "leading" case seems to be *Friedlander v. Adelphi Mfg. Co.*, 5 U.C.C.Rep.Serv. (Callaghan) 7, 9 (N.Y.Sup.Ct.1968), which refused to subordinate a security interest relating to a future advance, stating that "[t]here is nothing in the Uniform Commercial Code tending to negative the one

security interest approach ...." The dearth of authority may be due to the fact that

> cases in which a secured creditor will willingly make subsequent advances after another creditor has gone through the tedious process leading to a lien on the collateral are likely to be as scarce as hen's teeth.... [I]mposition of judicial liens is much more likely to precipitate bankruptcy than to cause another lender to make subsequent advances.

White & Summers, Uniform Commercial Code § 25–2 at 1033 (2d ed. 1980). In practical

both sides to the controversy were concerned only with the problems of future advances in the ordinary sense of those words and that it occurred to neither to question the established priority of non-advance obligations under § 9–301(1)(b).

The focus on future advances continued in 1972, when sections 9–301(4), –307(3), and –312(5), dealing, respectively, with lien creditors, certain purchasers of collateral, and rival secured parties, were added to the Code. Sections 9–301(4) and –307(3) generally accepted Coogan's conclusion that security interests relating to advances created subsequent to the intervention of a third party as a lien creditor or purchaser should be subordinated to the interest of the third party. As regards the intervening lien creditor, the "Reasons for 1972 Change," *supra,* observed that

> [i]t seems unfair to make it possible for a debtor and secured party with knowledge of the judgment lien to squeeze out a judgment creditor who has successfully levied on a valuable equity subject to a security interest, by permitting later enlargement of the security interest by an additional advance, unless the advance was committed in advance without such knowledge. Proposed Section 9–301(4) provides that a lien creditor does not take subject to a subsequent advance unless it is given or committed without knowledge, but there is an exception protecting future advances within 45 days after the levy regardless of knowledge.

On this formulation it is tolerably clear that § 9–301(4) was intended to protect lien creditors by giving them a special priority *only* against security interests securing certain sorts of future advances; nothing suggests an intention to upset the general

rule as to non-advance obligations in § 9–301(1)(b).[8]

It is particularly instructive to compare § 9–307(3), which, according to the "Reasons for 1972 Change," was to deal with the "similar" problem that arose where the intervening party was a buyer (other than a buyer in the ordinary course of business) of collateral subject to a security interest. There the perceived unfairness to the buyer was dealt with by providing that he

> takes free of a security interest to the extent that it secures future advances made after the secured party acquires knowledge of the purchase, or more than 45 days after the purchase, whichever first occurs, unless made pursuant to a commitment entered into without knowledge of the purchase and before the expiration of the 45 day period.

Unlike § 9–301(4), § 9–307(3) leaves no room to argue that the intervening buyer takes free of a security interest securing obligations such as those here at issue, whether or not they are within the four categories of protected future advances. We cannot think of any reason why a levying creditor should stand better in that respect.

■ In light of the foregoing, we think the conclusion is irresistible that a drafting failure occurred with respect to § 9–301(4). The draftsmen of the 1972 amendments had no thought that they were addressing the problem of the relative priority of interests securing obligations not involving advances and judicial liens. They made this plain in § 9–307(3); there is not the slightest reason to think they intended anything different with respect to § 9–301(4). Upholding Aetna's position here in no way countenances action by "a debtor and secured party with knowledge of the judg-

---

terms, § 9–301(4) thus appears to have been directed to a problem of quite limited scope.

**8.** The discussions of § 9–301(4) in the leading commentators uniformly treat it as stating a rule as to future advances and nothing more. *See, e.g.,* 2 R. Alderman, A Transactional Guide to the Uniform Commercial Code § 7.62 (2d ed. 1983); B. Clark, The Law of Secured Transactions Under the Uniform Commercial Code

§ 3.2[5] (1980); R. Henson, Secured Transactions Under the Uniform Commercial Code, *supra* note 4, at §§ 5–12 to –15; White & Summers, Uniform Commercial Code, *supra* note 7, at § 25–2. If it had been thought that § 9–301(4) subordinated all security interests securing non-advance obligations to subsequent judicial liens, the commentators would surely have said so.

ment lien to squeeze out a judgment creditor who has successfully levied on a valuable equity subject to a security interest, by permitting later enlargement of the security interest by an additional advance," the evil at which the 1972 changes were aimed. We have been instructed that when the "plain meaning" of statutory language leads to "absurd or futile results," we should look "beyond the words to the purpose" and, indeed, that we should do this "even when the plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole.'" *United States v. American Trucking Ass'ns,* 310 U.S. 534, 543, 60 S.Ct. 1059, 1063 (1940) (quoting *Ozawa v. United States,* 260 U.S. 178, 194, 43 S.Ct. 65, 67, 67 L.Ed. 199 (1922)). A literal application of § 9–301(4), which would subordinate a prior-perfected security interest to a judicial lien insofar as the former secures a non-advance obligation relating to a transaction prior to the levy, like that of the debtor to pay interest or even to reimburse the creditor for attorneys' fees incurred reasonably and in good faith with respect to loans made prior to the imposition of the lien or otherwise protected from it, would yield results so plainly unreasonable and inconsistent with commercial practice that such an interpretation must be avoided. We thus deem it appropriate to read that section in the slightly changed manner set forth in the margin,[9] thereby bringing it in line with § 9–307(3), in order to carry out the purpose announced in the "Reasons for 1972 Change" and to avoid an unintended consequence of the words chosen. On such a construction the relative priority of Aetna's interest, insofar as it secured Best Banana's non-advance obligations relating to protected advances, and of Warner's garnishment lien must be determined under the general rule of § 9–301(1)(b), not the

special provision regarding future advances in § 9–301(4). As under the 1962 Code, Aetna's prior-perfected security interest should prevail against the lien, notwithstanding that the obligations, relating to transactions before the date of garnishment, became due only subsequent thereto. Thus, while we accept Warner's argument that Aetna's payments for attorneys' fees and other litigation expenses are not protected advances within the letter of § 9–301(4) since they were neither "advances" in the ordinary meaning of language nor made pursuant to a prior commitment to Best Banana, they nevertheless take priority over Warner's lien.[10] It is unnecessary to decide whether Aetna's placing itself at risk in connection with the L/C transaction for which Best Banana would indemnify it constituted an advance. If it did, as seemingly would be the case, Aetna would be protected even under the letter of section 9–301(4) since Aetna's action long antedated January 11, 1980, the date on which Warner served garnishment process; alternatively, if it were considered not to constitute an advance, its priority is also protected under what we deem the proper construction of § 9–301(4). We prefer not to decide whether Aetna's right to enforce Best Banana's obligation to pay "minimum monthly charges" for interest and commissions, which is clearly not a protected advance under § 9–301(4), should nevertheless receive priority because of Aetna's perfection of its security interest.

■ Although we are confident that this would be the correct result if the case were here for the first time, we must now consider whether we may properly take this course in light of the determination in *Warner I.*

In *Warner I,* the court's instructions to the district court upon remand proceeded on the assumption that Aetna could prevail

---

**9.** A person who becomes a lien creditor while a security interest is perfected takes free of the security interest to the extent that it secures advances made more than 45 days after he became a lien creditor, unless made without knowledge of the lien or pursuant to a com-

mitment entered into without knowledge of the lien.

**10.** The result would be different if the attorneys' fees related to advances not within any of the four categories protected by § 9–301(4).

only by bringing its claims within one of the four protected categories listed in § 9–301(4). This assumption evidently rested on the further assumption that the payments for which Aetna was seeking reimbursement were "advances" and, having been made after the initial credit agreement, were "future advances." It is understandable that the court would have made this latter assumption since on the prior appeal there was no clear indication that any party was suggesting that any of the Aetna payments in issue were not advances. Moreover, examination of the briefs on the prior appeal indicates that no one raised the issue whether § 9–301(4) truly governs the priority of security interests such as those here asserted by Aetna *vis-a-vis* a judicial lien,[11] or even mentioned the inconsistency between the language of § 9–301(4) and that of § 9–307(3).

However, as our statement of the earlier proceedings has shown, all that *Warner I* needed to decide, and all that it did decide, was that the conditions affecting the "dueness" of Aetna's collateral should be considered conditions subsequent under Connecticut garnishment law. 700 F.2d at 862–63. This holding meant that Warner had achieved the status of intervening lien creditor under Connecticut law, and led the court to reverse Judge Blumenfeld's first decision. While the court did go on to suggest that "[t]he priority of Warner's lien, as against Aetna's security interest for future advances, is determined by section 9–301(4)," *id.* at 863, it noted that the district court had not considered the application of § 9–301(4) and explained that it had "neither the factual record nor the guidance of a district court's opinion in the first instance necessary to resolve this dispute on appeal," *id.* The court concluded that "[w]e need not and do not now assess this or any alternative theory of section 9–301(4)," *id.* at 863 n. 5.

In light of this, we do not deem the issue whether the letter of § 9–301(4) governs the priority of the obligations at issue in this case to be settled either as *stare decisis* or as the law of the case. We recognize that Aetna's ineffective presentation on the first appeal has produced costs to Warner and the expenditure of much judicial time that could have been avoided by a more thorough analysis on Aetna's part. However, taking account of all the circumstances, particularly the extraordinary importance of the issue here presented both to those extending and to those seeking credit,[12] we do not think it appropriate, even with respect to these litigants, to countenance what we are convinced would be a misapplication of § 9–301(4) of the U.C.C.

On the appeal, the judgment is affirmed. The cross-appeal is dismissed. No costs.

---

**11.** The point was perhaps intimated by Judge Blumenfeld in a footnote to his first opinion, *see* 538 F.Supp. at 1052 n. 5, but Aetna's brief on the first appeal made nothing of the suggestion. We read Aetna's brief on this appeal, however, as raising the question of the applicability of § 9–301(4). *See* Brief for Plaintiff-Appellant at 16–22, 37–38.

**12.** Our previous decision has already attracted comment. *See* Carlson & Shupack, *supra* note 2; Smith, *U.C.C. Survey: Secured Transactions,* 39 Bus.L. 1395 (1984).