978 F.2d 984
 18 UCC Rep.Serv.2d 993
 UNI IMPORTS, INCORPORATED, doing business as UNI,
Incorporated, Plaintiff-Appellee,
v.
APARACOR, INCORPORATED, Defendant,
and
Exchange National Bank of Chicago, also known as LaSalle
National Bank, Appellant.
 No. 91-1876.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 8, 1991.
Decided Nov. 2, 1992.
 
 1
 David E. Reynolds (argued), Lewis, D'Amato, Brisbois & Bisgaard, Los Angeles, Cal., for plaintiff-appellee.
 
 
 2
 Eric S. Rein (argued), Schwartz, Cooper, Kolb & Gaynor, Chicago, Ill., for defendant and appellant.
 
 
 3
 Before CUMMINGS and RIPPLE, Circuit Judges, and CRABB, Chief District Judge.[1]
 
 
 4
 CRABB, Chief District Judge.
 
 
 5
 This appeal raises an issue best described as one of those "delicious academic morsels so dear to the hearts and minds of commercial law teachers," 2 James J. White & Robert S. Summers, Uniform Commercial Code, § 26-1, 491 (Practitioner's ed. 1988). The actual circumstances in which it arises occur very seldom; similar cases are "as scarce as hen's teeth." Id. at 493. The case arises out of supplementary proceedings held in the district court on a petition by UNI, INC., for a turnover of assets in the possession of Exchange National Bank of Chicago. It involves the relative priorities between a judgment creditor and a secured lender of lines of credit, the applicability of Ill.Rev.Stat. ch. 26, p 9-301(4), and the treatment of non-advance expenditures by a secured creditor.
 
 
 6
 On UNI's motion for summary judgment, the district court held that Exchange was required to turn over assets sufficient to satisfy UNI's lien. That holding may be correct, but the present record does not allow an affirmance. Under § 9-301(4), Exchange's perfected security interest has priority over UNI's judgment lien to the extent that the interest secures advances made within 45 days after the lien attached; the $274,000 payment that Exchange made after the expiration of the 45-day grace period following attachment of UNI's lien and before the assignment for the benefit of creditors is not protected from subordination to that lien. Whether Exchange has claims to reimbursement that take priority over UNI's security interest in the $274,000 advance is a question we cannot answer on the present record. The district court did not analyze the various expenditures and payments made by Exchange after the 45-day period to determine whether Exchange has a right to reimbursement superior to that of UNI. We will remand the matter to allow the district court to make that analysis.
 
 
 7
 The parties do not dispute any of the following material facts.
 
 FACTS
 
 8
 On August 12, 1987, Exchange National Bank and Aparacor, Inc. executed a document entitled "Security Agreement," which granted Exchange a security interest in Aparacor's assets at Exchange. On October 9, 1987, the two executed a note due April 30, 1988, which incorporated the security agreement and established a revolving line of credit of up to $7.2 million for Aparacor and related entities. After the note expired, Exchange continued to make advances of funds without an additional written agreement.
 
 
 9
 On November 18, 1988, UNI obtained a $66,000 judgment against Aparacor in the United States District Court for the Central District of California. UNI registered the judgment in the United States District Court for the Northern District of Illinois. On January 12, 1989, UNI tried to enforce the judgment against Aparacor's assets at Exchange by delivering a writ of execution to the United States Marshals Service. The marshals service served the writ on Exchange the following day, but Exchange refused to turn over any of Aparacor's assets, contending that it had priority status.
 
 
 10
 Exchange continued to advance money to Aparacor. On February 3, 1989, Exchange and Aparacor executed a document titled "Modification Note" that purported to modify the October 1987 note and to reduce Aparacor's revolving credit to $5.4 million. By February 26, 1989 (45 days after Exchange had been served with the writ), the principal balance of Aparacor's loan had grown to approximately $2.8 million from a balance of approximately $780,000 as of January 12, 1989. Between February 26, 1989 and March 2, 1989, Exchange advanced an additional $274,000 to Aparacor. On March 2, 1989, Aparacor executed an assignment for the benefit of creditors.[2] Between March 2 and May 31, 1989, Exchange made additional payments of over $2 million as follows:
 
 
 11
 After the assignment on March 2, 1989, Exchange credited to Aparacor's outstanding balance the following: credit collections from accounts receivable, $2,584,638.21; proceeds from the sale of real estate and equipment, $1,414,287.30; and proceeds from the application of a certificate of deposit, $51,203.00, for a total of $4,050,128.51.
 
 
 12
 On September 27, 1990, UNI petitioned the district court for turnover of Aparacor's assets in the possession of Exchange. The court granted the petition and this appeal followed. UNI's $66,000 judgment has not been satisfied. Aparacor still owes $938,553.78 to Exchange.
 
 JURISDICTION
 
 13
 This court has jurisdiction over the appeal because it is from a final order entered by the district court. 28 U.S.C. § 1291. The district court had jurisdiction over the turnover proceeding by virtue of the parties' diversity of citizenship and an amount in dispute in excess of $50,000. 28 U.S.C. § 1332. Therefore, state law provides the substantive law of decision. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The parties have argued only Illinois law; we accept their implicit choice of the law of the forum state. The controlling law is the Uniform Commercial Code as adopted in Illinois and codified at Ill.Rev.Stats. ch. 26.
 
 OPINION
 
 14
 When a person in need of money borrows a lump sum secured by specific collateral, such as real estate, the question of priorities between the lender and any subsequent person who obtains a judgment against the borrower is relatively straightforward: the judgment creditor's interest is subordinate to the lender's, so long as the lender has obtained and perfected a security interest in the borrower's realty before the lien attaches. This straightforward situation becomes complicated when the borrower wants a line of credit rather than a lump sum loan and when the collateral is a constantly changing one in the form of inventory or accounts receivable. Scholars and practitioners have debated whether the lender's security interest in the collateral attaches from the outset, that is, from the first advance under the line of credit (the "unitary" theory), or whether each advance gives rise to a new security interest, each of which arises no earlier than the time the creditor extends value (the "multiple" theory). See discussion in Dick Warner Cargo Handling Corp. v. Aetna Business Credit, 746 F.2d 126, 130-33 (2d Cir.1984); Jeanne L. Schroeder & David Gray Carlson, Future Nonadvance Obligations Under Article 9 of the UCC: Legitimate Priority or Unwarranted Squeeze-Out? 102 Banking L.J. 412 (1985); William T. Plumb, Federal Tax Liens and Priorities--Agenda for the Next Decade II, 77 Yale L.J. 605, 659-61 (1968).
 
 
 15
 The passage of the Federal Tax Lien Act of 1966 focused attention on the scope of the "floating lien" that attached to inventory or other changing collateral. Supreme Court rulings prior to 1966 had subordinated security interests based on after-acquired property or future advances to federal tax liens on the ground that such interests were "inchoate," that is, not certain in amount, identity of collateral or identity of creditor. See generally, Peter F. Coogan, The Effect of the Federal Tax Lien Act of 1966 Upon Security Interests Created under the Uniform Commercial Code, 81 Harv.L.Rev. 1369, 1375-80 (1968). The Tax Lien Act addressed the perceived need to save such security interests from subordination to subsequent tax liens. See David Gray Carlson and Paul M. Shupack, Judicial Lien Priorities Under Article 9 of the Uniform Commercial Code: Part I, 5 Cardozo L.Rev. 287, 349 (1984). The drafters of the Tax Lien Act defined a security interest as "any interest in property acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against loss or liability," 26 U.S.C. § 6323(h)(1), adding that such an interest exists at any time "if, at such time, the property is in existence and the interest has become protected under local law against a subsequent judgment lien arising out of an unsecured obligation...." Id. This definition of a "choate" security interest made it a matter of practical importance to determine whether a particular interest would or would not be subordinated to a judgment lien because the drafters of the Tax Lien Act did not want tax liens subordinated to floating liens that would be subordinate in turn to judicial liens. Schroeder & Carlson, supra, 5 Banking L.J. at 421. To protect revolving credit security interests from subordination to tax liens under the hypothetical lien creditor test in the Tax Lien Act, the drafters of the 1972 amendments to the Uniform Commercial Code added subsection (4) to § 9-301 to provide that
 
 
 16
 [a] person who becomes a lien creditor while a security interest is perfected takes subject to the security interest only to the extent that it secures advances made before he becomes a lien creditor or within 45 days thereafter or made without knowledge of the lien or pursuant to a commitment entered into without knowledge of the lien.
 
 
 17
 The section rests on the assumption that the multiple theory is operative for future advances, that is, each advance gives rise to a new security interest, which arises when the creditor extends value. See Dick Warner Cargo Handling Corp. v. Aetna Business Credit, 746 F.2d at 133:
 
 
 18
 Sections 9-301(4) and -307(3) generally accepted Coogan's conclusion that security interests relating to advances created subsequent to the intervention of a third party as lien creditor or purchaser should be subordinated to the interest of the third party. [Citing Coogan & Gordon, The Effect of the Uniform Commercial Code upon Receivables Financing, 76 Harv.L.Rev. 1529, 1549-51 (1963).]
 
 
 19
 Section 9-301(4) applies to situations in which there is a "perfected" security interest in existence when the judgment lien attaches. (Perfection occurs when a debtor signs a security agreement containing a description of the collateral, value has been given and the debtor has rights in the collateral. Ill.Rev.Stat. ch. 26, p 9-203(2).) Under p 9-301(4), future advances are protected (1) in all cases for 45 days following attachment of the lien; (2) beyond 45 days if the secured party makes the advance without knowledge of the lien; and (3) beyond 45 days if the secured party is committed to make advances, provided the commitment was entered into without knowledge of the lien. As Carlson and Shupack point out, the first two situations provide important protections: "A lender with knowledge will certainly cease advancing funds, if he can, and a lender without knowledge will be protected if he manages to maintain his ignorance." Carlson & Shupack, supra, 5 Cardozo L.Rev. at 349 (footnotes omitted). In the third situation, the special provision for commitments made before the lien attached reflects pre-UCC law that "the security interest for advances made pursuant to a binding commitment came into existence when that commitment was made and therefore comes ahead" of a lien creditor even if the lien attaches between the time the commitment is made and the first actual advance of funds. Id. Such binding commitments are differentiated from agreements providing for advances but not committing the lender to make them.
 
 
 20
 Left unanswered by the drafters of § 9-301(4) was the question of the treatment of the other parts of a secured obligation such as interest and collection expenses. Were these different parts of the obligation subsumed by the term "advances" (and treated identically) or did they give rise to their own security interests and, if so, did those security interests arise when value was given or at the outset when the obligation was entered into? In the only case to address this issue, Dick Warner Cargo Handling Corp. v. Aetna Business Credit, 746 F.2d 126, the Court of Appeals for the Second Circuit concluded that the separate parts of the obligation were not intended to be treated as advances. Although the court did not say so explicitly, in effect it treated such obligations as giving rise to their own security interests, at least some of which arose with the execution of the financing agreement.
 
 
 21
 Exchange relies on § 9-301(4) and the Second Circuit's opinion in Dick Warner for its contention that it is entitled to be reimbursed ahead of UNI for all of the funds it provided Aparacor after January 12, 1989, the date on which the lien attached.[3] Exchange's position is that the funds provided to Aparacor before March 2, 1989 (the day of the assignment for the benefit of creditors) were advances made pursuant to binding commitments agreed to in the original loan agreement with Aparacor, modified and revived by the modification agreement of February 3, 1989. Therefore, argues Exchange, those advances have priority over UNI's judgment lien under the exception in § 9-301(4) for advances made "pursuant to a commitment entered into without knowledge of the lien." Alternatively, Exchange maintains, the payments it made after March 2, 1989 were not advances, but were payments related to other aspects of the secured obligation: the kinds of expenses that Judge Friendly chose to refer to as "non-advances" in the Dick Warner case. Exchange contends that it has a priority interest in those expenditures that overrides that of UNI. Exchange concedes that if the modification note is considered a new agreement, UNI might have a priority interest in the $274,000 advanced to Aparacor between February 26 and March 2, but contends that because it has not yet been reimbursed in full for its protected (pre-February 26) advances and for its protected "non-advances," the question of the relative priorities to the $274,000 never arises.
 
 
 22
 The district court addressed only the first of these arguments. It concluded that the February 3, 1989 agreement was not a mere modification of the 1987 revolving line of credit, but a new commitment entered into after Exchange had knowledge of UNI's lien, and therefore one that offered Exchange no protection for any advances made after the expiration of the 45-day period on February 26, 1989.[4] UN Imports, d/b/a UNI, INC. v. Aparacor, slip op. at 5-6, 1991 WL 49563 (N.D.Ill. Apr. 3, 1991). The court noted that although the 1987 note expired on April 30, 1988, nine months before the execution of the modification agreement, the modification note was not executed until almost one month after Exchange received formal notice of UNI's lien. The court was not impressed by the language in the note stating the parties' intent to "further modify and restate the obligations set forth in the Note...." Modification Note at 1. The "crucial fact beyond dispute is that any prior commitment requiring [Exchange] to make continued advances to Aparacor ended in April, 1988." UN Imports, slip op. at 5.
 
 
 23
 Exchange makes little effort to explain how it could have retained a binding commitment from a matured note. The cases it cites do not support its assertion. The district court was well justified in finding that the modification note was a new commitment entered into by Exchange with full knowledge of UNI's intervening lien, and that the parties had not succeeded in reviving the original, expired note by their execution of the modification note.[5] Given this finding, the district court did not need to analyze the nature of the original security agreement between the parties to determine whether the agreement constituted a binding commitment as Exchange contended.
 
 
 24
 Having reached the conclusion that the modification note represented a new commitment made with knowledge of UNI's lien, the district court ordered the bank to turn over to UNI assets sufficient to satisfy its lien. It had authority to issue such an order pursuant to Ill.Rev.Stat. ch. 110, p 2-1402. Bank of Aspen v. Fox Cartage, Inc., 126 Ill.2d 307, 127 Ill.Dec. 952, 533 N.E.2d 1080 (1989). The district court did not address the second argument advanced by the bank: that it had a priority interest in all of the assets it withdrew for crediting to Aparacor's outstanding loan balance because the money from those assets was applied to reimburse the bank for payments it had made "to preserve and protect collateral," and that under the Second Circuit's holding in Dick Warner, 746 F.2d 126, such payments are "non-advances" for which the lender is entitled to priority reimbursement.
 
 
 25
 Neither this court nor the state courts of Illinois have had occasion to address § 9-301(4)'s treatment of "non-advances." Exchange argues that in such a situation the Illinois courts would defer to the decision of the Court of Appeals for the Second Circuit in Dick Warner, in order to promote the Uniform Commercial Code's policy of uniformity.
 
 
 26
 In Dick Warner, 746 F.2d 126, Aetna and Best Banana had entered into a financing arrangement under which Aetna had agreed to lend money to Best Banana in its discretion and to obtain letters of credit to enable Best Banana to make purchases from overseas suppliers. The security agreement obligated Best Banana to indemnify Aetna for any liability incurred in connection with any letter of credit or with Aetna's application for such a letter, and to reimburse Aetna for its expenses in enforcing or protecting its security interest or its rights under any of the Agreements or in respect of any of the transactions under the agreement, and to pay Aetna a minimum monthly payment of $7,500. After Aetna had advanced funds and applied for the issuance of an irrevocable letter of credit for the benefit of the banana shipper, Dick Warner Cargo Handling unloaded two shipments of bananas, both of which Best Banana rejected as defective. Aetna asked the issuer of the letter of credit not to honor the letter. Dick Warner sued Best Banana for its services and obtained a judgment in Virginia that it sought to enforce in Connecticut through garnishment of Best Banana's credit balance with Aetna. Aetna had in its possession a "lockbox" bank account consisting of collections of Best Banana's encumbered accounts. After Aetna deducted $353,577 to discharge Best Banana's current indebtedness for advances, interest and other charges, the bank account had a net credit balance of about $46,000, which Aetna was keeping as additional security for obligations of Best Banana that might accrue later, including liability for the dishonored letter of credit, attorneys' fees and the "minimum monthly charge."
 
 
 27
 The Second Circuit held that Aetna's interest in the credit balance had priority over Dick Warner's lien, based on Best Banana's undertaking in the original financing agreement to reimburse Aetna for attorneys' fees and other expenses it might incur in defending against suits such as Dick Warner's. According to the court, the drafters of § 9-301(4) did not intend to include such expenditures by the lender in the term "advances" because the lender's obligation to advance funds to the borrower differs from the lender's obligation for expenses in connection with the loan, such as attorneys' fees. Expenditures in the latter category
 
 
 28
 do not constitute "advances" as that term is commonly used; in the ordinary meaning of language, "advances" are sums put at the disposal of the borrower--not expenditures made by the lender for his own benefit. See, e.g., Black's Law Dictionary, 48 (5th ed. 1979).
 
 
 29
 Id. at 130. The Second Circuit suggested use of the term "non-advances" for the debtor's obligation to pay interest and indemnify the lender for various expenses it has incurred. The court held that a lender that perfects its security interest with respect to such obligations is entitled to protection against a subsequent lien creditor. In other words, the lender is entitled to priority reimbursement insofar as a prior-perfected security interest
 
 
 30
 secures a non-advance obligation relating to a transaction prior to the levy, like that of the debtor to pay interest or even to reimburse the creditor for attorneys' fees incurred reasonably and in good faith with respect to loans made prior to the imposition of the lien or otherwise protected by it.
 
 
 31
 Id. at 134. The court took the view that the drafters of § 9-301(4) never intended to include non-advance obligations under this section. Thus, although for the purpose of the section, advances were treated as multiple (giving rise to a new security interest with each new advance), the treatment of future "non-advance" obligations was not affected by the new § 9-301(4). Such obligations retained their unitary character, relating back to the original agreement. They continued to have priority over a later judicial lien if they had been undertaken before the lien attached, even if they did not mature until after attachment. The court acknowledged that a straightforward reading of § 9-301(4) would not support such an interpretation, but concluded that it was what the drafters must have meant and that any other result "would be so plainly unreasonable and inconsistent with commercial practice that such an interpretation must be avoided." Dick Warner, 746 F.2d at 134.
 
 
 32
 The result reached in Dick Warner is not wholly convincing. As a general rule, security interests under Article 9 do not arise until value is extended. The court does not explain satisfactorily why it should be different for "non-advances." Although protecting non-advances benefits revolving credit lenders and thus, presumably improves debtors' chances of obtaining such loans, it does so at the cost of squeezing out lien creditors. One can reasonably ask whether it is fair or commercially useful to strike the balance in favor of the financier. After all, the lender in these situations has a close and continuing relationship with the debtor, enabling him to supervise and control all of the debtor's transactions, whereas the judgment lien creditor may well be an involuntary creditor of the debtor. See Grant Gilmore, The Good Faith Purchase Idea and the Uniform Commercial Code: Confessions of a Repentant Draftsman, 15 Ga.L.Rev. 605, 627 (1981) ("[T]he financing assignee, who serves a useful function in providing working-capital loans is not an ignorant stranger.... He does not need to be insulated, as a matter of law, from the risks of the transactions in which [his borrowers] engage. Because he can investigate, supervise, and control, he should be encouraged to do so and penalized if he has not done so.") The drafters of the 1972 amendment noted this unfairness with respect to future advances:
 
 
 33
 It seems unfair to make it possible for a debtor and secured party with knowledge of the judgment lien to squeeze out a judgment creditor who has successfully levied on a valuable equity subject to a security interest, by permitting later enlargement of the security interest, by an additional advance, unless that advance was committed in advance without such knowledge. [Footnote omitted.]
 
 
 34
 U.C.C. § 9-312 (1972) Reasons for 1972 Change. Ironically, the possibility of squeeze-out posed by future advances is less than for non-advance value. Future advances have the positive value of enlarging the estate; reimbursing the secured creditor for non-advance value only depletes the estate. In Dick Warner, for example, Best Banana was obligated to pay Aetna a $7500 minimum monthly charge. Aetna had no incentive and no apparent obligation to stop the running of the charge, other than the declining balance of Best Banana's lockbox account.
 
 
 35
 Nonetheless, the Dick Warner result is endorsed by the Permanent Editorial Board for the Uniform Commercial Code. In Commentary No. 2, March 10, 1990, the board added the following paragraph to the commentary to § 9-301(4):
 
 
 36
 The word "only" in subsection (4) is limited in its effect to the lien creditor's subjection to the specified advances. It does not limit the lien creditor's subjection to whatever other rights the secured party may have by contract or law, e.g., the right to interest before or after the attachment of the judgment lien to the collateral or the right to foreclosure expenses or other collection expenses.
 
 
 37
 In light of this commentary and the holding of the Second Circuit, we conclude that the Illinois courts would hold that § 9-301(4) does not apply to non-advances. This conclusion is not the end of the inquiry in this case, however. It remains to be determined just which non-advance payments and expenditures have priority under UNI's lien. Neither Dick Warner nor the Permanent Editorial Board's commentary can be read as giving priority to every expense claimed by a secured creditor, whenever incurred and for whatever purpose.
 
 
 38
 In Dick Warner, Judge Friendly gave priority to non-advance obligations that "related to transactions before the date of the levy," even if the obligation did not become due until after the levy. 746 F.2d at 134. Included in this category were attorneys' fees and other litigation expenses, id., and interest on protected advances accruing after the creation of the lien, as well as interest obligations accruing before the levy, id. at 130-31. With respect to letters of credit, Judge Friendly found it unnecessary to decide whether a creditor's placing itself at risk in connection with letters of credit would constitute an advance or a non-advance whose priority would be protected under the court's interpretation of § 9-301(4), although he leaned toward treating the commitment to back a letter of credit as an advance. Finally, he refrained expressly from deciding whether Best Banana's obligation to pay minimum monthly charges for interest and commissions should receive priority as a non-advance.
 
 
 39
 In this case, the next inquiry will be to determine the rights Exchange had under its original agreement with Aparacor and to decide which of Exchange's post-February 26 payments are reimbursable under the terms of that agreement, or under any applicable law. Since those questions have not been briefed and the factual record has not been developed, we cannot resolve it. However, we can decide whether Exchange has any contractual right to priority arising from non-advance obligations incurred in connection with the protected advances it made within the 45-day period after the levy. We conclude that it has no such right. At the time of the levy, the agreement between Exchange and Aparacor had expired. In these unusual circumstances, Exchange can rely only on the original, expired agreement as the source of any preexisting contractual right to reimbursement for interest, collection expenses, or other costs paid for after the levy on January 12, 1989. When UNI levied on the funds in the possession of Exchange, UNI's lien was subordinate to (1) all of the advances Exchange made prior to the levy; (2) the advances Exchange made between the date of the levy and February 26, 1989; and (3) whatever other rights Exchange had under the law and its original agreement with Aparacor, including the right to pre-lien and post-lien interest on advances made under that agreement. The lien was not subject to any rights Exchange may have acquired under the modification agreement, since those rights did not exist until after the levy.[6] In other words, Exchange has no priority over UNI with respect to interest on advances made after the levy, expenses of collection of the collateral securing the post-lien advances, or attorneys' fees not incurred under the terms of the original agreement.
 
 
 40
 On remand, the district court may find it more helpful to use the Permanent Editorial Board's terminology: "rights under contract or law" rather than Dick Warner 's definition: "relating to transactions before the date of the levy." It will be Exchange's burden to show what pre-lien contract rights give it priority to reimbursement out of the funds collected during the assignment for benefit of creditors, as well as to show that its non-advance expenses were "incurred reasonably and in good faith." Dick Warner, 746 F.2d at 134. (Because the record contains no facts about the assignment for benefit of creditors, we leave that subject unaddressed. It may well be, however, that the district court will have to examine the assignment to determine whether it has any bearing on Exchange's priority rights under Illinois law.)
 
 
 41
 Each of the parties raises one additional point. Exchange argues that its right to setoff overrides any finding in favor of UNI's right to collect its judgment. This is an argument that Exchange had a duty to make in the district court when the need for raising such a defense would have been obvious. It failed to do so and thereby waived the argument. Capps v. Humble Oil & Refining, 536 F.2d 80, 82 (5th Cir.1976).
 
 
 42
 UNI maintains that the normal rules of "first-in, first-out" accounting prevent Exchange from using funds in Aparacor's accounts to extinguish Aparacor's debt for the $274,000 advanced to Aparacor between February 27 and March 2 before UNI's priority interest was satisfied. UNI is correct that Exchange cannot extinguish this debt until it has paid UNI; however, Exchange has the right to reimburse itself for any expenditure that the district court finds is covered by the terms of Exchange's prior security agreement and for advances made within 45 days after UNI filed its lien, because it has priority over UNI for recovery of these payments and expenses. At the present time, Exchange is contending that it has not been reimbursed for approximately $938,000. If Exchange can prove to the satisfaction of the district court that its claim for reimbursement for all of its post-lien payouts and expenditures other than the unprotected $274,000 advance has priority over UNI's lien it will have no obligation to turn over funds to UNI until and unless Exchange comes into possession of property of Aparacor worth more than $664,000. Of course, if Exchange cannot make such a showing, it will be obligated to turn over the $66,000 UNI is claiming. In sum, the "first-in, first-out" rule adds nothing to UNI's case.
 
 
 43
 This matter will be remanded to the district court for further proceedings in accordance with this opinion. Circuit Rule 36 shall not apply.
 
 
 44
 RIPPLE, Circuit Judge, concurring.
 
 
 45
 I join the judgment of the court and, with one exception, all of the thoughtful and scholarly opinion of my colleagues.
 
 
 46
 While the court determines that the Illinois courts would follow Dick Warner Cargo Handling Corp. v. Aetna Business Credit, 746 F.2d 126 (2d Cir.1984), it also suggests, gratuitously, that that decision is "not wholly convincing." I respectfully decline to endorse this unnecessary and, in my view, inaccurate estimation.
 
 
 
 [1]
 The Hon. Barbara B. Crabb, Chief Judge of the Western District of Wisconsin, is sitting by designation
 
 
 [2]
 The record does not reveal any facts about the assignment. We do not know its terms, the identity of the assignee, or whether creditors other than Exchange received payments during the course of the assignment
 Advances to Assignee-- $ 636,595
Payment of Sales Commissions-- 419,080
Payment of Real Estate Taxes-- 728,753
Payment of Interest under Modification Note to Mar. 2-- 27,056
Payment of Mechanics' Lien-- 2,200
Payment of Legal Fees-- 30,708
Letter of Credit Draws-- 277,716
Miscellaneous-- 19,326
 ----------
 TOTAL $2,141,438
 
 
 [3]
 Under Illinois law, the lien attached when UNI delivered the writ of execution to the marshal. Asher v. United States, 570 F.2d 682, 683 (7th Cir.1978). Neither UNI nor Exchange denies that when UNI delivered the writ to the marshal it obtained a lien on the money in Aparacor's accounts at Exchange
 
 
 [4]
 Technically, the period expired on February 25, 1989, 45 days after the lien attached upon delivery to the marshal for service. The district court counted from the date of service (January 13). UNI has advised this court that it has no objection to the use of the later date
 
 
 [5]
 This does not mean that Exchange was not secured or that it lost its priority as a secured creditor during the period between written agreements. Its interest in the property and the priority of that interest vis-a-vis other secured creditors were protected from the time it filed its financing statement. See U.C.C. § 9-312, Official Comment n. 5, example 5 (1990); Thomas H. Jackson & Anthony T. Kronman, Secured Financing and Priorities Among Creditors, 88 Yale L.J. 1143, 1178 (1979) ("[I]f C 1 files a financing statement on May 30, and C 2 files a financing statement covering the same collateral on June 30, C 1's interest in the property will have priority over C 2's, regardless of the order in which they actually make their loans or satisfy the requirements for perfection.") Whether Exchange had priority over a judgment lien creditor at that time is a separate issue
 
 
 [6]
 We leave for another day the question whether a secured creditor is entitled to priority for obligations incurred in connection with post-lien advances paid out within 45 days of the levying of a judgment lien that are made pursuant to an unexpired agreement